FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAY 1 6 2008

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

MESA AIR GROUP, INC. and
FREEDOM AIRLINES, INC.,              )
                                     )
                                     )
              Plaintiffs             )
                                     )
                                     )     CIVIL
       v.                            )     ACTION:      1:08-CV-1334-CEC
                                     )
                                     )
DELTA AIR LINES INC.,                )
                                     )
              Defendant              )
_____ )

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Dwight J. Davis
David E. Meadows
Ryan J. Szczepanik
KING & SPALDING, LLP
1180 Peachtree Street
Atlanta, Georgia 30309

*Counsel for Defendant
Delta Air Lines Inc.*

## INTRODUCTION

This litigation represents Plaintiffs' effort to hold Delta hostage to a contract that it has the legal right to terminate due to Plaintiffs' doomed performance over a long period of time. Freedom Airlines, Inc. ("Freedom"), an operating subsidiary of Mesa Air Group, Inc. ("Mesa"), operated under the Delta Connection Agreement ("Agreement") as a Delta Air Lines Inc. ("Delta") Connection carrier. *See id.* On March 28, 2008, Delta terminated the Agreement because, despite Freedom's erroneous reports to the contrary, Freedom failed three times in a six month period to maintain a completion rate of at least 95%, as the Agreement unequivocally required. *Id.* Completion rate is a simple performance metric for airlines -- i.e., the ratio of completed flights (flights that actually reach their destination, excluding, per the Agreement, flights more than four hours late or with no revenue passengers) to scheduled flights.

Plaintiffs allege that Freedom met the required completion rate alleging that the calculation of completion rate excludes so called "Commanded Cancellations" -- a phrase that appears nowhere in the Agreement, and which is a term that Plaintiffs and their lawyers invented for this litigation. Plaintiffs urge that the Court to ignore the plain meaning of the Agreement and to adopt an interpretation that the Plaintiffs never subscribed to. Internal Mesa documents show that, for

years, *and until as late as March of this year,* Plaintiffs expressly acknowledged that "completion rate" simply meant "completed flights divided by divided flights" with no exception for so-called "Commanded Cancellations." All evidence shows that Plaintiffs were well-aware of their dismal performance and they wanted to re-write the Agreement to include a modification. Plaintiffs now ask this Court to give them what they were never able to negotiate with Delta. Plaintiffs are not entitled to a preliminary injunction, because their claims are baseless.

## STATEMENT OF FACTS

## I.      THE PARTIES

Delta is one of the world's largest airlines. In addition to operating its own flights, Delta partners with other carriers to provide regional flight service. Mesa, through its operating subsidiaries such as Freedom, is one of those regional carriers.

## II.     THE DELTA CONNECTION AGREEMENT

Under the terms of the Agreement, Freedom agreed to operate regional jets on behalf of Delta. Delta retained the right to set flight schedules, market the flights, sell tickets, and compensate Mesa for operating the flights. Before the parties entered into the Agreement there were no promises that Mesa would operate only out of a given airport. To the contrary, with limited exceptions

spelled out in the Agreement, Freedom was required to operate flights from the airports of Delta's choosing. While the Agreement prevented Delta from moving any Freedom flights to certain listed airports, Delta was free to, for example, require Freedom to fly into and out of New York's John F. Kennedy International Airport. In fact, the Agreement specifically contemplated this possibility.

In the Agreement, the parties also agreed that if Freedom failed to meet or exceed a 95% completion rate in three of any consecutive six month period, Delta was entitled to terminate the Agreement immediately and without notice. Further, the parties expressly agreed that flights delayed more than four hours and flights without paying passengers would not be counted as completed flights.

The 95% completion rate is by airline industry standards an extremely low performance standard. An airline that on a consistent basis fails to complete five out of every 100 flights, no matter where an airline operates, is seriously deficient in operational capability.

Before the Agreement was signed, the parties specifically discussed and agreed that the completion rate would be an "all-in" calculation. No cancelled flights would be counted as anything other than cancelled flights. The parties chose not to enter into an agreement that excused certain cancellations precisely to avoid disputes with respect to how particular cancellations should be classified.

When used, a "controllable completion rate" would be coupled with a much higher termination rate of 97% or 98%.

Indeed, even the Plaintiffs admit that they counted all cancellations as non-completed flights, from the inception of the Agreement in May 2005 through at least August 2007. Furthermore, internal Mesa documents show that Mesa's senior management well understood, apparently until almost the eve of filing this lawsuit, that completion rate included no exceptions for any kind of cancellations, including the newly-invented concept of "Commanded Cancellations."

## III.   COORDINATED CANCELLATIONS

Bad weather and air traffic control ("ATC") restrictions do occur in the airline industry, and flights must very rarely be cancelled to accommodate reduced throughput rates at affected airports. Delta meets daily with its connection carriers, including Freedom, to discuss weather, ATC, and other operational issues, and seeks to coordinate cancellation of flights with all of the carriers to best serve passengers in the combined Delta system. Of course, given that ATC restrictions are caused by weather or congestion, the regional carriers would have to cancel these flights in any event. Delta's coordination merely serves to minimize the disruption. Mesa "understands this business philosophy, believes it is appropriate, and recognizes that a coordinated operation of mainline and regional flights is

essential to the system." Pl. Br. at 8 [Doc. 24-2].   Importantly, at not time did "Coordinated Cancellations" ever approach 5% of the flights scheduled.   In fact, during the months relevant to this dispute, the "Coordinated Cancellations" never even accounted for 1% of flights scheduled.

It is important to note, however, that while Delta may request that a carrier reduce operations to accommodate conditions, Delta may not, and does not, "command," "direct," or "require" that carriers, including Freedom, cancel any number of flights or any particular flight.   Each carrier is required by law to maintain operational control of its own airline, and is alone responsible to decide which if any flights it will operate on a given day.   Delta certainly expects that its regional carriers will cooperate in situations that require reduced capacity and proactive cancellations, to better serve Delta passengers and to achieve better operational results for Delta *and* its regional carriers.   Delta simply does not control whether any regional carrier actually does cancel any particular flight. Deposition of J.T. Fisher (rough draft) ("Fisher Dep.") at  49, Ex. A ("Delta OCC cannot make a decision to cancel a -- cancel a flight of a carrier").

## IV.   PLAINTIFFS ATTEMPT TO MODIFY THE AGREEMENT

Plaintiffs well understood that, as written, the Agreement required all cancellations to be counted as exactly what they are -- uncompleted flights.   But

Plaintiffs eventually realized that because of the large number of cancellations caused by their poor performance (e.g., cancellations due to mechanical problems, lack of crew, etc.) and the cancellations due to weather and traffic congestion, they were at risk of triggering the termination provision in the Agreement. Plaintiffs did not argue that "Coordinated Cancellations" did not count under the Agreement, but instead sought to modify it. As early as February 2007, Plaintiffs approached Delta about changing the Agreement's "all-in" completion rate to a "controllable" completion rate. These efforts -- which are detailed below -- continued through March 2008, to no avail. Plaintiffs admit that there has been no modification to the Agreement. Plaintiffs' Responses to Defendant's First Interrogatories at 11, Ex. B (Interrogatory No. 8).

## V.   PLAINTIFFS HELP THEMSELVES TO THE MODIFICATION THEY WERE UNABLE TO NEGOTIATE

Under the terms of the Agreement, Plaintiffs were obligated to provide Delta with a daily and monthly accounting of Plaintiffs' operational performance metrics. Agreement, §10. This included an obligation to report Plaintiffs' completion rate. Delta was entitled to and, in fact, did rely on Plaintiffs' reports for purposes of measuring Plaintiffs' performance and for calculating Plaintiffs' compensation.

Plaintiffs now admit that, for over two years, they counted "Commanded Cancellations" as uncompleted flights in their reporting to Delta. Pl. Br. at 7.  In December 2007, however, Plaintiffs abruptly began excluding "Commanded Cancellations" from their "completion rate." *Id.* at 10.  Plaintiffs' invoices did not disclose this change.  A junior level Delta employee noticed a discrepancy, however, and questioned Bud Tyler, Mesa's Director of Contract Revenue about it. Tyler responded that an agreement existed which allowed Mesa to take credit for "Commanded Cancellations."  Plaintiffs' own documents prove that assertion was completely false.  In reliance on that false claim, the Delta employee processed the invoice for payment.

Once more senior Delta officials became aware of Plaintiffs' misreporting, Delta audited Plaintiffs' invoices, as is Delta's right under the Agreement, and recalculated Plaintiffs' completion rates per the Agreement's plain terms.  When it did so, Delta learned that Plaintiffs had not only helped themselves to an exception for "Commanded Cancellations" that never existed, but they had been routinely failing to report, as uncompleted, flights flown four or more hours late and those flown with no revenue passengers. Once corrected, Plaintiffs' completion rates fell below 95% in three out of six months (October 2007, December 2007 and

February 2008) during the previous six months, and Delta terminated the Connection Agreement pursuant to its contractual right.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy," that will not be granted unless and until the "movant clearly carries the burden of persuasion as to . . . four prerequisites." *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (internal citation omitted). Those prerequisites are (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if an injunction is not granted; (3) that the threatened injury to the moving party outweighs the harm an injunction may cause the opposing party; and (4) that granting the injunction would not disserve the public interest. *Suntrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1265 (11th Cir. 2001) (citation omitted). There is no "sliding scale" standard in which a strong showing on one element will compensate for a weak showing on another: If any one of these elements has not been demonstrated, the motion for preliminary injunction must be denied. *Cunningham v. Adams,* 808 F.2d 815, 819 (11th Cir. 1987). Granting preliminary injunction is very much the exception as opposed to the rule. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

Plaintiffs cannot simply rely on the unsupported allegations of their unverified complaint. Rather, they "must offer proof beyond the unverified allegations of the pleadings" in order to meet the heavy burden of proof on each element. *Bascom Food Prods. Corp. v. Reese Finer Foods*, Inc. 715 F. Supp. 616, 624 n. 14 (D.N.J. 1989); *see also* 11A Charles Allan Wright et al., *Federal Practice and Procedure* §2949, at 214 (2d ed. 1995).

## I.    PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

Under the "likelihood of success" prong, Plaintiffs must show "a very clear and strong case" that Delta had no right to terminate the Agreement. *Golden Bear Int'l, Inc. v. Bear U.S.A., Inc.*, 969 F. Supp. 742, 748 (N.D. Ga. 1996) (internal citation omitted). If Plaintiffs' claims present "close questions," Plaintiffs "ha[ve] not established a 'likelihood of success' on the merits." *Id.* at 749.

The terms of the Agreement and the Plaintiffs' own admissions belie any reasonable notion that Delta's actions were other than appropriate and within Delta's rights.

### A.    The Agreement contains no exceptions for "Commanded Cancellations."

In construing the terms of a contract under New York law, as required by the Agreement, a court must "give effect to the parties' intentions." *Federal Ins. Co.*

*v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (N.Y. App. Div. 1999) (internal citation omitted). To that end, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (internal citation omitted). Indeed, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.*

As discussed, a completion rate is a simple ratio of completed flights to scheduled flights.[1] Plaintiffs nonetheless argue that they may contort the plain meaning of this phrase to treat "Commanded Cancellations" as uncompleted flights. The Agreement does not mention "Commanded Cancellations," much less purport to treat them differently from any other cancellations. Had the parties wished to provide that a "Commanded Cancellation" may be excluded from the calculation of Freedom's completion rate, they could have done so explicitly. But they did not.

The evidence will show that the absence of an exception for "Commanded Cancellations" was no oversight. The evidence developed to date clearly shows that the parties made a conscious decision to use the unqualified term "completion

---

[1] This is well-recognized in the airline industry. Airlines are required by federal law to publicly report their completion rates based on the simple ratio described above.

rate" precisely because attempting to exempt cancellations beyond the control of the regional carrier is inherently unworkable.   J.T. Fisher, one of the principal negotiators of the Agreement, testified:

> Q.   Do you recall telling Mesa or Mesa asking what went into that completion rate, that 95 percent, how it would be calculated?
>
> A.   Absolutely.  Because you could have different approaches of how you could do this.  You could do it with a very specific, let's exclude weather, let's exclude ATC, let's exclude X, Y, and Z.  The problem with that is it leads to too many disputes. . . . So we had discussions with numerous carriers over time in other agreements that led us to believe that rather than going down the path of defining exactly what's in and what's out and then arguing over the accounting, that it made more sense to set a standard said it's all inclusive. …
>
> A.   I think it's very fair to say that both Peter [Murnane] and Mike [Lotz] were involved in this discussions around this.

Fisher Dep. at  96, 99 Ex. A.

It is all the more obvious that "Commanded Cancellations" were not excluded because the parties negotiated two express exceptions to the simple completion rate calculus -- those flown over four hours late and those flown with no revenue passengers.   Put simply, the parties knew exactly how to make exceptions to the ordinary definition of completion rate because they did so for delayed and empty flights.   Yet they made no exception of any kind with respect to "Commanded Cancellations."   Under New York law, "[a] court may not rewrite into a contract conditions the parties did not insert, or under the guise of

construction, add or excise terms." *Barleo Homes, Inc. v. Tudomawr Corp.*, 625 N.Y.S.2d 599, 600 (N.Y. App. Div. 1995) (internal citation omitted).

New York law adheres to the cannon of contract construction that the expression of one thing implies the exclusion of others. *In re New York City Asbestos Litig.*, 838 N.Y.S.2d 76, 80 (N.Y. App Div. 2007). The Agreement provides for only two express adjustments to be used in calculating completion rate; excluding from the number of completed flights those operated (1) more than 4 hours late or (2) with no revenue passengers. The Agreement does not provide that completion rate should be adjusted by excluding "Commanded Cancellations" or any other cancellations from the number of uncompleted flights. The parties knew how to and in fact did agree to adjustments to the basic completion rate calculation (both of which are to Plaintiffs' detriment), and that express agreement disproves Plaintiffs' argument that other adjustments in their favor should be implied.

### B.     The parties interpreted "completion factor" to include all cancellations.

Plaintiffs' own documents plainly demonstrate that, prior to this lawsuit, they knew that "completion rate" was determined including *all* cancellations. This fact is of utmost importance since, under New York law, "the practical interpretation of a contract by the parties to it for any considerable period of time

before it comes to be the subject of controversy is deemed of great, if not controlling influence." *Federal Ins. Co.*, 691 N.Y.S.2d at 512 (internal citation omitted).

Plaintiffs alleged in their Complaint that "Mesa has **never** reported completion rates that included Commanded cancellations as uncompleted flights." Complaint, ¶ 33 [Doc. 1]. It took just one month for Plaintiffs to beat a hasty retreat from that spurious allegation. Plaintiffs now admit that, from the inception of the Agreement through July 2007 -- <u>a period of 26 months</u> -- they "simply counted Commanded Cancellations as non-complete flights." Pl. Br. at 7. [2] It was only in December 2007, when Mesa presented Delta with its "true-up" invoice for operations in September 2007, that Mesa first purported to count "Commanded Cancellations" as uncompleted flights.

Plaintiffs not only have a long history of treating "Commanded Cancellations" as exactly what they are -- uncompleted flights -- but a long history of admitting that, contrary to their allegations, they (a) always knew that

---

[2] Plaintiffs attempt to pass off this admission by claiming that Commanded Cancellations were "an insignificant issue" before July 2007. Pl. Br. at 7. That rationalization is conclusively belied by the many documents showing that Plaintiffs did, in fact, repeatedly make an issue of "Commanded Cancellations" both well before and well after July 2007.

completion rate included all cancellations, and (b) repeatedly but unsuccessfully

sought to renegotiate how their completion rate was calculated.  For example,

- On June 14, 2007, Jorn Bates noted in an e-mail to Mesa's CEO that "52 ATC/WX cancellations in the JFK System" caused Freedom to "dip to 94.8% Total Completion Factor (TCF) which is below our contractual minimum of 95.0%." Ex. C.

- Bud Tyler, Mesa's Director of Contract Revenue Management, similarly admitted in an August 16, 2006 e-mail that:  "Through yesterday, our jet total completion factor was 94.3%. Under the terms of our Delta contract, they do not pay any profit during months when our total completion factor is below 95%." Ex. D.  Thus, Plaintiffs' fully acknowledge that they adopted not a "controllable completion" concept in the Agreement but rather a "total completion" concept that necessarily includes "Commanded Cancellations."

- Jorn Bates, Mesa's Chief Operating Officer, interpreted language in another contract between Mesa and Delta that is *identical* to the termination language in the Agreement, as follows: "[T]hat started the clock on the 95% minimum completion factor Term and Termination Clause (vi) which basically states that Delta has the right to terminate this agreement immediately if we fail to maintain this completion rate during any (3) months during any consecutive 6 month period.  Of course the language refers to Total Completion not controllable . . . Basically they had the right to terminate the agreement at the end of December but had other priorities." Feb. 10, 2007 email from Jorn Bates to Jonathan Ornstein, Ex. E. (emphasis added).

## C.    Plaintiffs unsuccessfully tried to modify the Agreement to exclude cancellations requested by Delta.

The parties attempted modification but never came to an agreement.  Indeed,

Plaintiffs' Amended Complaint and brief ignores a very lengthy paper trail

documenting Plaintiffs' long-running and unsuccessful efforts to modify the

Agreement to give them credit for certain cancellations. That Plaintiffs sought such a modification itself shows that they correctly believed the Agreement to include *all* cancellations.

- Plaintiffs' failed efforts to negotiate a modification began as early as February 2007, when two internal Mesa documents noted that Mesa "need[s] to be able to reach an agreement on Commanded Cancellations" and outlined proposals to be made to Delta. Exs. F and G, respectively.

- No such renegotiation was ever completed. Indeed, the agenda for a June 25 meeting at Mesa's offices set aside time to discuss this topic. Ex. H.

- As of August 1, 2007, Jorn Bates wrote that "[w]e are diligently working with Delta to renegotiate our performance goals to better reflect the reality of the shift to flying into the Northeast." Ex. I.

- These efforts to renegotiate the Agreement indisputably continued, without success, through early March 2008, when Mesa employee Joe Serratelli wrote to Mesa's CEO that "attached is my latest draft to address the disagreement we are having with Delta and to resolve it going forward. I have included a recommendation on going to CCF and also have stated in the document that should we not resolve the disagreement over commanded xls, we Freedom will need to consider the financial impact and contract default implications before accepting requested cancels." Ex. J.

It is indisputable that, by this lawsuit, Plaintiffs seek to alter the Agreement to reflect the modification that they were unable to procure through negotiation.

### D.     Plaintiffs' new interpretations of the Agreement are untenable.

Plaintiffs strain to find support for their newly-minted and self-serving interpretation of the Agreement, arguing that Articles 3(H) and 21 show that completion rate excluded "Commanded Cancellations." These provisions,

however, are completely unrelated to the computation of Plaintiffs' completion rate under the Agreement and, therefore, they are irrelevant. Article 3H provides that Delta is to pay *a portion of* certain base compensation to Freedom if a particular flight does not operate "because of some action or inaction of Delta." First, Delta does not "cause" Freedom to cancel any flight for weather, ATC issues, or even under the new notion of "Commanded Cancellations."[3] The ultimate decision to cancel a flight is under the sole control of Freedom. Second, and more importantly, Article 3H does not use the term "completion rate" at all, much less remotely suggest that the non-operated flights in question should be excluded from the calculation of completion rate for any purpose. To the contrary, under Article 3H, even if a flight does not operate "because of some action or inaction of Delta," Plaintiffs still do not get all the compensation that would otherwise be due if the flight were actually completed, and *receive no Base Markup in respect of such flight.* Since Base Markup is paid only when Plaintiffs achieve a 95% completion rate, it is actually clear that Plaintiffs do not benefit from the non-operated flights contemplated in Article 3H when calculating completion rate.

---

[3] Plaintiffs concede that "Commanded Cancellations," whatever they are, arise from circumstances beyond Delta's control. Pl. Br. at 8 ("Air traffic control frequently limits the number of landings and take offs at JFK due to congestion, weather or otherwise.").

Plaintiffs' claim that Article 21 -- a force majeure clause - opens the door to excluding "Commanded Cancellations" is similarly confused. Such clauses are narrowly construed. *Team Marketing USA Corp. v. Power Pact, LLC*, 839 N.Y.S.2d 242, (N.Y. App. Div. 2007). Where, as here, the force majeure clause is a general catchall, it is limited "to only to the same general kind or class as those specifically mentioned." *Id.* Putting "Commanded Cancellations," which Plaintiffs themselves contend are an everyday occurrence, in the same category as acts of God, terrorism, and war defies common sense. The record developed to date also proves that Plaintiffs have never actually construed the Agreement in this way. Furthermore, the paragraph only concerns "obligations" and would not affect Delta's rights to cancel the Agreement.

### E.     Plaintiffs' Cannot Establish Waiver or Estoppel.

Plaintiffs for the first time assert that Delta should be estopped from terminating the Agreement and that Delta has waived any right to terminate the Agreement on such grounds. Pl. Br. at 19-20. Plaintiffs have not asserted a claim for relief based on waiver or estoppel in either their Complaint or Amended Complaint, however. This claim, therefore, is not properly before the Court and should be summarily disregarded. *See Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1370 n. 12 (S.D. Fla. 2004).

Regardless of the pleading deficiency, Plaintiffs fail to demonstrate any likelihood that they will succeed on these claims. Plaintiffs argue that Delta's alleged "conduct and assurances" effectively modified the Agreement, so as to waive Delta's right to terminate the Agreement based on completion rates that include "Commanded Cancellations." Again, Plaintiffs directly contradict an admission, made in discovery, that there was no modification. *See* Plaintiffs' Responses to Defendant's First Interrogatories at 11, Ex. B (Interrogatory No. 8).

Moreover, the Agreement provides that it only can be modified in writing signed by authorized representatives of both parties, and furthermore contains an express no-waiver clause. Agreement, § 23. Under New York law, "[i]t is axiomatic that a written agreement should be enforced according to its terms and a contractual clause precluding oral modification is enforceable." *Charles T. Driscoll Masonry Restoration Co.. v. County of Ulster*, 836 N.Y.S.2d 362, 365 (N.Y. App. Div. 2007) (internal citation omitted). To effectively waive a clause prohibiting oral modification, a party's conduct must demonstrate an "indisputable mutual departure from the written agreement [where] the changes were clearly requested by [the] defendant and executed by [the] plaintiff." *Id.* (internal citation omitted). Indeed, "(t)he intent to waive must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." *Ess & Vee Acoustical &*

*Lathing Contractors, Inc. v. Prato Verde, Inc.*, 702 N.Y.S.2d 38, 39 (N.Y. App. Div. 2000). Compensation paid to Plaintiffs as a result of deceptive and inaccurate bills submitted by Plaintiffs falls far short of the required "unmistakable manifestation" of Delta's intent to waive its rights under the Agreement. To the contrary, Delta relied on Plaintiffs' good faith to provide accurate completion rates and bills while Plaintiffs schemed and concealed their unilateral exclusion of "Commanded Cancellations." Moreover, Plaintiffs' own documents show that it knew no agreement had been reached to modify the Agreement, and that thus no waiver had been made. Simply, there has been no waiver, and Plaintiffs know it.

Plaintiffs' also cannot prevail on their claim for equitable estoppel. "Under New York law, a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise, and which does induce such action or forbearance, is enforceable . . . if injustice can be avoided only by enforcement of the promise." *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F. Supp. 347, 354 (S.D.N.Y. 1996). Most significantly, courts decline to extend the doctrine of equitable estoppel to situations where the plaintiff is fully aware of the risk associated with a chosen course of conduct, since these are not the "class of cases in which it would be unconscionable not to enforce the alleged oral promise." *Id.*

Plaintiffs knew the Agreement required the inclusion of all cancelled flights, even "Commanded Cancellations," in calculating their completion rate.  Further, they knew that Delta relied on Plaintiffs to report accurately the completion rate and that Delta would compensate Plaintiffs based on their reported performance. Plaintiffs betrayed Delta's reliance by attempting to modify the Agreement to exclude "Commanded Cancellations" without bothering to notify Delta and by knowingly reporting inaccurate completion rates.  Fully aware of the risk of getting caught, Plaintiffs now cry foul when it materialized.   Indeed, to hold Delta responsible for Plaintiffs' wrongful behavior would be "unconscionable."[4]

## II.   PLAINTIFFS HAVE NOT PROVED THEY WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED.

Plaintiffs' have not and likely cannot demonstrate actual and imminent irreparable harm, which precludes injunctive relief.  The Eleventh Circuit explains,

> An injury is 'irreparable' only if it cannot be undone through monetary remedies.   The key word in this consideration is irreparable.   Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'

---

[4] Moreover, Section 20(G) of the Agreement does not entitle Plaintiffs to an injunction because Defendant clearly has not breached the Agreement.

*Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (internal citation omitted).  Plaintiffs "must persuade the Court that the asserted irreparable harm is neither remote nor speculative, but actual and imminent." *Kalb v. Quixtar, Inc.*, No. 3:07-cv-1061-J-33, 2008 WL 879406, at *6 (M.D. Fla. Mar. 28, 2008) (internal citation omitted). Plaintiffs cannot make this showing.

Plaintiffs contend that they will suffer "irreparable" harm because the loss of Delta's Connection business "***may***" force Mesa and its subsidiaries into bankruptcy. Pl. Br. at 22.  Plaintiffs' hedge itself disposes of their claim.  It is not enough for Plaintiffs to say they "may" suffer irreparable harm; they must actually prove it.

But Plaintiffs' uncertainty about their financial future goes even deeper.  In their most recent proxy statement, dated April 7, 2008, Plaintiffs made clear that they are incapable of predicting what will happen if Delta succeeds in terminating the Agreement.  *See* Ex. K ("If Delta is successful in terminating the Connection Agreement, the *Company cannot predict as of the date of this proxy statement the total severity or extent of the combined impact of a termination upon the Company's operations, revenues, employees or ability in the future to operate as a going concern.*" (emphasis added)).

Plaintiffs' reliance on *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) and on dicta from *Rhodes v. Gwinnett County*, 557 F. Supp. 30, 33 n.9 (N.D. Ga. 1982) for the proposition that the complete loss of a business can constitute irreparable harm is badly misplaced. Both cases involved injunctions against local ordinances that effectively would have destroyed the plaintiffs' entire businesses, i.e. *Doran* (topless bars sued to enjoin an ordinance prohibiting topless entertainment) and *Rhodes* (plaintiff that sold display signs sued to enjoin a county ordinance prohibiting signs on others' business premises). These circumstances are a far cry from Mesa's loss of Delta's business allegedly representing 20% of Mesa's annual revenue.

Plaintiffs do not contend that they stand to lose their "entire" business; to the contrary, they have made clear that, at most, the Agreement comprises just 20% of their revenue. Pl. Br. at 22. In fact, Plaintiffs do not cite a single case suggesting that the loss of less than a quarter of a company's revenue cannot be adequately compensated by monetary damages.[5]

---

[5] Plaintiffs also cite *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir. 1989) and *Travellers Int'l AG v. Trans World Airlines,* Inc., 684 F. Supp. 1206, 1215-1216 (S.D.N.Y. 1988). In *Tucker Anthony*, there was "ample evidence of plaintiffs' bankruptcy absent the issuance of a preliminary injunction" because "[c]urrent liabilities exceed[ed] current assets" and plaintiffs' loans were "due on demand." In *Travellers Int'l*, 95% of plaintiff's business was tied up in a contract with defendant and, thus, termination of the contract would "destroy" plaintiff's

Plaintiffs' arguments are akin to the unsupported assertions that failed to establish irreparable harm in this court's decision in *American Booksellers Ass'n. v. Webb*, 590 F. Supp. 677, 689 (N.D. Ga. 1984), rev'd on other grounds, 919 F.2d 1493 (11th Cir. 1990). There, the court considered the dicta from *Rhodes* and held that plaintiffs made "no showing" of irreparable harm and "have not established that any significant portion of [plaintiff's] business" would be threatened. *Id.* Mesa likewise is not entitled to a preliminary injunction.

Even assuming that Plaintiffs' unsupported speculation was sufficient to show actual and imminent harm, that alleged harm clearly can be compensated by money damages, and, thus, it is not irreparable. *City of Jacksonville*, 896 F.2d at 1285. The type of injuries that Plaintiffs speculate that they may suffer -- quantifiable lost revenue -- are entirely common and routinely addressed by money damages. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802 (3rd Cir. 1989). "Simply put, economic losses alone do not justify a preliminary injunction." *Crawford v. Surf Style Retail Mgmt., Inc.,* No. 07-0645-WS-B, 2007 U.S. Dist. LEXIS 68334, at *8 (S.D. Ala. Sept. 14, 2007) (internal citation omitted).

---

business since plaintiff "is presently virtually completely dependent on [defendant] for its revenue." An alleged loss of approximately 20% of Mesa's annual revenue is not even a close comparison to the circumstances in those cases.

The Agreement can be terminated without cause in approximately four years. Accordingly, the most Plaintiffs can recover in the unlikely event that they prevail in this suit will be the profit they would receive during this period. The evidence will show Delta is certainly capable of paying that amount.

## III.  THE BALANCE OF HARDSHIP DOES NOT FAVOR A PRELIMINARY INJUNCTION

Forcing Delta to remain a party to the Agreement will harm Delta's reputation in the marketplace by its continued association with a carrier whose reputation has been tainted by poor performance. Further, calculating Delta's damages incurred from specific performance under the Agreement will be difficult given fuel costs and other volatile airline cost factors. Mesa's alleged damages, however, are quantifiable. The evidence in fact demonstrates that Plaintiffs do not actually know what impact termination of the Agreement would have.

## IV.  A PRELIMINARY INJUNCTION DOES NOT SERVE THE PUBLIC INTEREST

Mesa, if granted relief, will be permitted to remain a party to a contract that it wrongfully breached and continue to damage Delta's reputation by Mesa's dismal performance. To retain public trust, courts must hold parties accountable for clear breaches of contractual obligations. Furthermore, keeping an incompetent airline in a forced marriage cannot serve the public interest.

## **CONCLUSION**

Plaintiffs have failed to carry their burden to justify the issuance of a preliminary injunction.  Accordingly, the motion for preliminary injunction should be denied.


Dated:  May 16, 2008

Dwight J. Davis
Georgia Bar No. 208055
David E. Meadows
Georgia Bar No. 500352
Ryan J. Szczepanik
Georgia Bar No. 076141
*KING & SPALDING LLP*
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309-3521
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5140

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(D) of the Local Rules of the Northern District of Georgia, counsel for Delta Air Lines Inc. Ryan J. Szczepanik hereby certifies that this Memorandum was prepared in a font and point selection approved by this Court and authorized in Local Rule 5.1B.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | | |
|---|---|---|---|
| MESA AIR GROUP, INC. and<br>FREEDOM AIRLINES, INC., | ) | | |
| | ) | | |
| Plaintiffs | ) | | |
| | ) | | |
| v. | ) | CIVIL<br>ACTION: | 1:08-CV-1334-CEC |
| | ) | | |
| DELTA AIR LINES INC., | ) | | |
| | ) | | |
| Defendant | ) | | |
| | ) | | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing

**DEFENANT'S MEMORANDUM OF LAW IN OPPOSITION TO**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** will be served

upon counsel this day via U.S. mail, postage pre-paid, addressed as follows:

> David M. Monde
> G. Lee Garrett, Jr.
> Jones Day
> 1420 Peachtree Street, N.E.
> Atlanta, Georgia 30309

This 16th day of May, 2008.

Ryan J. Szczepanik