FILED IN CLERK'S OFFICE
U S D C   Atlanta

MAY 2 2 2008

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| MESA AIR GROUP, INC., and FREEDOM AIRLINES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DELTA AIR LINES INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION

FILE NO. 1:08-CV-1334-CEC

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

G. Lee Garrett, Jr.
David M. Monde
Michael Wolak, III
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia  30309-3053

Counsel for Plaintiffs

# INTRODUCTION

Mesa Air Group, Inc. ("Mesa Air") and its wholly-owned subsidiary, Freedom Airlines, Inc. ("Freedom," and together with Mesa Air, "Mesa") and Delta Air Lines Inc. ("Delta") are parties to a long-term contract called the "Delta Connection Agreement" (the "Contract") under which Mesa flies a fleet of regional jets for Delta. Mesa moves for a preliminary injunction to enjoin Delta's wrongful attempt to terminate the Contract early.

Facing rising fuel costs and growing competition, and seeking to facilitate its anticipated merger with Northwest Airlines, Delta has publicly expressed its intent to boost profits by cutting capacity of available airline seats, especially in its fleet of smaller regional jets. To carry out this objective, Delta has targeted the Contract and engineered a pretextual basis for attempting to terminate it — after Delta unsuccessfully tried to "buy out" Mesa from the Contract. Specifically, Delta made a unilateral and self-serving decision to cancel certain Mesa flights to now claim that Mesa failed to meet the required completion rates to manufacture "cause" for early termination.

Mesa seeks a declaration that no grounds exist for termination, an order requiring specific performance, and a preliminary injunction enjoining Delta from its attempted termination until final resolution of this action. The injury threatened

by Delta's wrongful termination is irreparable, as Mesa will likely be unable to continue as a going concern, and will likely be forced into bankruptcy.

Under the Contract, Mesa operates for Delta 34 regional jet aircraft under a code-sharing arrangement. In essence, Delta sets the schedule and Mesa supplies and flies the aircraft. Mesa has dedicated considerable resources to fulfilling its obligations under the Contract, including buying or leasing more than $600 million worth of aircraft and equipment, providing or contracting for required maintenance, repairs and overhauls, and hiring and training employees to support all aspects of the aircraft operation, including flight crews. Because these assets cannot be readily re-deployed, the Contract does not permit termination for convenience or without cause through November 3, 2012, and then only with 12 months' prior written notice. Before November 2012, the Contract provides only limited grounds for termination.

Mesa has performed its obligations under the Contract since its inception on May 3, 2005, and has at times earned incentive compensation for superior performance. Delta has never claimed that Mesa's flight completion rate fell below Contract standards — until Delta recently decided that it no longer wanted the Contract, unsuccessfully tried to buy out Mesa from the Contract, and then tried to change mid-stream the way it measured Mesa's flight completions under

the Contract as a pretext for purporting to terminate it.

Specifically, Delta's newly minted contract interpretation counts flights that Delta <u>directed</u> Mesa not to fly — called Commanded Cancellations[1] — as non-completed flights when Delta calculates Mesa's monthly completion rate. Delta's Contract interpretation is inconsistent with the plain language of the Contract, the parties' prior interpretation of the Contract, and Delta's prior method of calculating Mesa's monthly compensation under the Contract. Under Delta's new and improper interpretation, Delta can order Mesa to cancel flights, use those canceled flights to claim that Mesa failed to meet the contractual completion rate, and terminate the Contract at will. Delta's flawed Contract theory is a self-fulfilling prophecy: if Delta issues enough orders to Mesa not to fly, Delta can cancel the Contract for its convenience, leaving Mesa with 34 regional jets that it cannot redeploy, loss of $20 million in monthly revenue needed to pay for those assets (representing approximately 20 percent of Mesa's total revenue), and hundreds of

---

[1] "Commanded Cancellations" – sometimes referred to by Delta as "coordinated cancels," "mainline initiated cancellations," "priority cancellations," or "proactive cancellations" – are cancellations directed by Delta of Mesa ERJ-145 aircraft flights operated under the Contract, as well as other regional carriers in the Delta Connection Program. Commanded Cancellations – typically issued to Mesa through Delta's Operations Control Center (OCC) – are issued by Delta for its own convenience and to allow its larger aircraft that contain more passengers and generate more revenue to depart or land, and are not issued because of any inability or unwillingness of Mesa to fly the Aircraft under the Contract.

Mesa employees serving Delta under the Contract without jobs.

Delta has announced that on May 31, 2008, it will carry out its attempted termination. Unless the Court immediately and preliminarily enjoins Delta's wrongful attempted termination, Mesa will face a critical liquidity crisis which will likely force Mesa into bankruptcy, constituting immediate and irreparable harm.

## STATEMENT OF FACTS

### *The Delta Connection Contract*

On May 3, 2005, Mesa Air, Freedom and Delta entered into the Contract (*see* Am. Compl. [Doc. 14], Ex. A [Doc. 14-2]), under which Mesa supplies and Freedom operates up to 30 Embraer regional aircraft (the "Aircraft") as a Delta Connection Carrier under a codesharing arrangement with Delta.[2] Delta sets and publishes Freedom's fees and schedules under Delta's two letter flight designator code ("DL") in scheduled city pairs specified by Delta.

In exchange, Delta is obligated to pay Mesa: (1) certain "Direct Costs" defined in the Contract; (2) a "Base Mark-up," consisting of a 4% mark-up of Direct Costs for any month in which Mesa achieves a "completion rate" of at least

---

[2] On March 13, 2007, the parties entered into "Amendment Number One to Delta Connection Contract." (*See* Am. Compl. [Doc. 14], Ex. B [Doc. 14-3]). Amendment Number One provided for the addition and removal of certain aircraft under the Contract and addressed issues related to Delta's emergence from bankruptcy. The Contract terms relevant to this action were unchanged.

95%; and (3) "Monthly Incentive Compensation," consisting of an additional 1% mark-up of Direct Costs for any month in which Mesa achieves the monthly incentive goal designated for that particular month – generally a "completion rate" of 97% or more.  Contract, § 3.

Mesa is obligated to complete a certain percentage of scheduled flights each month ("Completion Rate") to earn base and incentive compensation.  The Contract empowers Delta to modify Mesa's flight schedules at any time for Delta's convenience.  Delta frequently exercised this right to benefit flights it operated itself (so-called "mainline aircraft," typically larger aircraft with more passengers and therefore more revenue on board), primarily during periods of irregular operations involving weather, congestion, or other air traffic control restrictions. Such Commanded Cancellations are directed by Delta for its convenience and to maximize its revenues, not because of an inability or unwillingness of Mesa to operate those flights.  The Contract states that Delta is not obligated to pay Mesa for flights not operated — provided the failure to operate "is substantially not within the control of or not caused by some action or inaction of Delta . . . ." Contract, § 3H.

The grounds for termination are limited.  Contract, § 11.  The Contract requires a substantial investment by Mesa in aircraft, personnel and maintenance in

order for Mesa to perform. Because these assets cannot be readily re-deployed, if at all, Mesa would be unable to perform its obligations under the aircraft leases, maintenance agreements and other contracts related to the Aircraft without the revenue from the Contract. The parties thus agreed that early termination of the Contract for convenience or without cause could not occur during the first 7 ½ years (until November 3, 2012), and only with 12 months' notice. Contract, § 11G.

The Completion Rate used to calculate compensation is also a basis for early termination. Delta is entitled to terminate the Contract early if Mesa "fails to maintain a completion rate of 95% during any three months of any consecutive six month period . . . ." Contract, § 11F(vi). This is the clause upon which Delta relies. Plainly, if Mesa cancels the flight because of weather or a mechanical issue, the flight is considered "non-complete" when calculating the monthly completion rates. In addition, the Contract states that Delta Connection Flights operated with no revenue passengers ("ferry flights" to re-position aircraft for maintenance or similar reasons) or completed over four hours late shall be considered as not completed. *Id.* There is no Contract language, however, permitting Delta to count Commanded Cancellations ordered by Delta against Mesa in measuring its Completion Rates or asserting grounds for termination, as Delta now seeks to do.

- 6 -

### *The Contract Arose Based On Mesa's Hub In Orlando*

The Contract was negotiated and arose based on Mesa operating mainly across Florida, with its hub in Orlando.  Given Florida's good weather and lack of congested air space, particularly in contrast to the crowded northeast, and the efficient operations at Orlando, Commanded Cancellations were in an insignificant issue.  For the 21 months between October 2005 through June 2007, Delta ordered Mesa to take only 60 Commanded Cancellations, and many of those were related to Mesa's flights in and out of Atlanta's Hartsfield-Jackson Airport.  Because the Commanded Cancellations were so few in number while based in Orlando and had no effect on Mesa's compensation under the Contract or required completion rate, Mesa early on simply counted Commanded Cancellations as non-complete flights, even though the Contract had no such requirement.

### *Delta Moves Mesa's Hub to JFK in 2007, and Delta's Commanded Cancellations Rise Dramatically*

In July 2007, Delta moved Mesa's hub and thus a substantial number of flights from Orlando to John F. Kennedy International Airport in New York ("JFK").  Flying in and out of JFK presented a number of new challenges to Mesa, relative to Orlando.  JFK is in one of the most congested air travel spaces in the world.  Poor weather and resulting schedule impacts are far more common.  Because JFK is one of Delta's largest international hubs, with over 400 flights per

day on average arriving from and departing to domestic and international

destinations, Delta makes operation of those international and long-haul domestic

flights a top priority.  Air traffic control frequently limits the number of landings

and take offs at JFK due to congestion, weather or otherwise, in what are known as

ground delay programs or flow control initiatives.  In response, Delta must decide

which of the many flights it controls (Delta mainline and regional carriers like

Mesa) will utilize the reduced air space, and which flights must be sacrificed for

the good of the overall operation.  Rather than cancel a large Delta jet containing

hundreds of people and generating far more revenue, Delta will more often direct

Mesa and Delta's other regional carriers to cancel flights, which seat far fewer

passengers.  Mesa understands this business philosophy, believes it is appropriate,

and recognizes that a coordinated operation of mainline and regional flights is

essential to the system.  But the notion that in the name of such "coordination,"

Delta can direct Mesa not to fly and then use Mesa's adherence to that direction as

grounds to terminate is contrary to the Contract and its purpose, industry practice,

the public interest and common sense.

The number of Commanded Cancellations jumped substantially after Delta

directed Mesa to move its base of operations to JFK.  In just the 7 months between

September, 2007 through March, 2008, Delta directed Mesa to cancel more than

- 8 -

400 flights, (*see* Mesa's Resp. to Delta's Interrog. No. 10, attached hereto as Exhibit A).  In the three months during which Delta now claims Mesa fell below a 95% Completion Rate — October, 2007, December, 2007 and February, 2008 — Delta ordered Mesa not to fly 85, 108 and 88 flights respectively, each more in one month than the 60 Commanded Cancellations over 21 months while based in Orlando. *Id.*

Moving Mesa's hub from Orlando to JFK was Delta's right under the Contract, but subject to Delta's contractual obligation to discuss with Mesa revision of compensation benchmarks, which includes completion rate, and Delta's duty of good faith expressly required by the Contract (and implied in all contracts). *See* Contract, §§ 1C; 26.  Mesa raised concerns that JFK presented unfavorable operational and weather challenges that would make it more difficult for Mesa to earn bonus pay for superior completion rates and that Delta would order more Commanded Cancellations.  Delta assured Mesa that it would not be "penalized" for moving to JFK and having to operate under far more challenging conditions.  These assurances are consistent with the Contract, the parties' prior conduct and their expectations – namely that Commanded Cancellations mandated by major airlines, such as Delta, should not adversely impact the calculated completion rates of contractually-partnered carriers such as Mesa.  As explained below, Delta

continued to compensate Mesa and not count Commanded Cancellations against Mesa until March, 2008 when it summarily and without warning purported to terminate the Contract.

After each month of flying, Mesa sends Delta a spreadsheet reflecting Mesa's calculation of its completion rate. Since September 2007 – after Delta moved Mesa's hub to JFK – Mesa has not counted Commanded Cancellations (or flights delayed more than four hours but operated nonetheless at Delta's request) as uncompleted flights in reporting completion rates to Delta. In one instance, Mesa specifically informed Delta that Mesa had exceeded the bonus performance target after taking into consideration Commanded Cancellations. Delta paid based on this calculated Completion Rate. Mesa has consistently met or exceeded the 95% completion rate entitling it to the Base Mark-up and has periodically exceeded the completion rate entitling it to Monthly Incentive Compensation. Delta consistently paid these performance-related bonuses based on the Completion Rates reported by Mesa, until March 2008, when Delta retroactively "recalculated" the completion rates for September 2007 through February 2008 by counting Commanded Cancellations (*and* flights delayed more than four hours but operated nonetheless at Delta's request) against Mesa in measuring its Completion Rates.

### *Delta's Pretextual Basis for Alleged Default and Termination*

The Contract requires Delta to discuss with Mesa any concerns about performance under the Contract, and the parties have held regular discussions about operational issues under the Contract since its inception. Tellingly, prior to March 28, 2008, Delta <u>never</u> stated or suggested that Mesa's completion rate under the Contract had fallen below 95% for any three out of six month period, or that the Contract was at risk of termination for any reason, including failure to meet the required Completion Rate.

On March 18, 2008, Delta announced at a financial analyst conference that it would seek to reduce its regional jet fleet by 20 to 25 aircraft. Around the same time, Delta approached Mesa about buying out the Contract. Delta represented that it was seeking to buy out Mesa not because of any concerns with Mesa's performance under the Contract, but because of all its contracts with regional carriers, Delta had targeted the Contract as "the cheapest one to get out of." Mesa responded that while it was willing to discuss a buyout, Mesa was concerned about the tremendous disruption termination would have on the company and its people, and thus Mesa's price was likely to be more than Delta would be willing to accept.

Apparently unhappy with this response, Delta sent a letter to Mesa on March 28, 2008 (the "Termination Letter"), purporting to terminate the Contract under

Article 11F(vi), alleging that Mesa had not met a 95% completion rate for October

2007, December 2007 and February 2008 (the "Challenged Months") (*See* Am.

Compl. [Doc. 14], Ex. C [Doc. 14-4]).  The termination was supposedly effective

immediately, subject to Delta's offer to enter into a transition agreement to provide

for "an orderly wind-down of Mesa's ERJ-145 Delta Connection operations"

between June and September 2008.  Delta has since entered into a written

agreement to operate under the Contract's terms through May 31, 2008.

Delta's stated ground for the purported termination is merely a pretext for its

profit-driven desire to get out early of a long-term contract it no longer wants.

Delta's alleged termination is based on its mid-stream change in calculating the

completion rate, using a method contrary to the Contract's terms, the parties' prior

interpretation, Delta's previous payments to Mesa and its representations when

Delta moved Mesa's flights to JFK.  As the attachment to the Termination Letter

shows, Delta counted against Mesa all of the Commanded Cancellations that Delta

unilaterally ordered for Delta's convenience – even though Mesa was ready,

willing and able to operate those flights – to allow more Delta jets to land and take

off when JFK's operations were curtailed.

Thus, in its Termination Letter, Delta alleged that Mesa's Completion Rates

in October 2007, December 2007 and February 2008 were 94.2%, 94.7% and 93%,

respectively – results only obtained by changing the method of calculation to count

Commanded Cancellations against Mesa. Had Delta applied the method of

calculation required by the Contract and the practice followed by the parties up

until March, 2008, Mesa's Completion Rates in October 2007, December 2007 and

February 2008 were 96.5%, 97.4% and 95.7%, respectively. Thus, not only did

Mesa comfortably surpass the 95% minimum entitling it to the Base Mark-Up for

each of the Challenged Months, it earned Monthly Incentive Compensation for one

of the Challenged Months, and for four out of the six months, for which Delta has

retroactively "recalculated" Mesa's Completion Rates.

In addition, notwithstanding the Contract language, Delta had always paid

Mesa for flights more than four hours late but operated nonetheless at Delta's

request. As part of its effort to manufacture grounds to terminate, Delta attempted

to retroactively alter this practice and "recalculate" completion rates by counting

such delayed flights against Mesa. As discussed below, principles of mutual

departure, waiver and estoppel preclude such an effort.[3] But even treating such

delayed flights as not completed, Mesa's completion rates for the Challenged

Months were 95.2%, 95.6% and 94.2%, and provide no grounds for termination.

Thus, there was and is no legitimate basis for Delta to terminate the Contract.

_____

[3] *See, e.g., Austin v. Barber*, 642 N.Y.S.2d 972, 974 (N.Y. App. Div. 1996)
(conduct of parties resulted in a mutual departure from the written contract).

# ARGUMENT

To obtain a preliminary injunction, the moving party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005). In the Contract, Delta conceded that "[b]ecause a breach of the provisions of this Agreement could not adequately be compensated by money damages, any party *shall be entitled to an injunction restraining such breach or threatened breach and to specific performance* of any provision of this Agreement ...." Contract, § 20G (emphasis added). In addition to this concession, Mesa has more than met its burden on each element.

## I.  Mesa and Freedom Are Likely to Prevail on the Merits of Their Claims.

### A.  Delta Wrongfully Terminated the Contract

Delta bases its purported termination on Article 11F(vi) of the Contract, which provides that Delta may terminate the agreement if:

> [Mesa] fails to maintain a completion rate of ninety-five percent (95%) with respect to the Delta Connection Flights during any three (3) months during any consecutive six (6) month period commencing with the date at least thirty-three percent (33%) of the Aircraft have

- 14 -

been scheduled to be placed into service in the Delta Connection
Program.  For purposes of this Agreement, Delta Connection Flights
operated with no revenue passengers or completed over four (4) hours
late shall be considered as not completed.

Contract, § 11F(vi).

This provision does not allow for Commanded Cancellations, or flights

cancelled at Delta's request, to be considered as "not completed" for purposes of

calculating Mesa's Completion Rate.  Additionally, other provisions in the

Contract confirm that Commanded Cancellations, or flights cancelled at Delta's

request, are not counted against Mesa's Completion Rate.[4]

First, Article 3, titled "Compensation," repeatedly refers to Mesa's

Completion Rate, which is a factor in determining elements of Mesa's Base

Compensation and various types of Incentive Compensation and is the same

Completion Rate referred to in Article 11F(vi).  Subsection H of Article 3 details

the accounting to be used when Mesa's flights are cancelled due to a number of

circumstances, including flights not operated due to "some action or inaction of

Delta," or other events beyond Mesa's control.  Contract, § 3H (emphasis added).

---

[4] Delta argues that Article 1C, Article 3A, E, and H,  Article 10, and Article
11F(vi) of the Contract permit Delta to treat Commanded Cancellations as
uncompleted flights and count Commanded Cancellations against Mesa's
Completion Rate.  (*See* Delta's Resp. to Mesa's Interrog. No. 11, attached hereto
as Exhibit B.)  None of these provisions, however – construed individually or as a
whole – support Delta's flawed interpretation of the Contract.

Specifically, the relevant portion of Article 3H provides Mesa certain compensation where "the non-operated Aircraft or Delta Connection Flight is caused by some action or inaction of Delta," ensuring that Mesa will not be penalized due to cancellations caused by Delta. *Id.* Cancellations "caused by" Delta necessarily include Commanded Cancellations, which are mandated by Delta and are exclusively within Delta's control.  Nothing in Article 3 allows Delta to count Commanded Cancellations against Mesa's Completion Rate.  Moreover, it is illogical for Delta to contend that cancellations commanded by Delta cannot be counted against Mesa for compensation purposes, but can be used to eliminate all compensation by terminating the Contract.

Second, Article 21 of the Contract expressly relieves Mesa of obligations when Mesa's performance is "delayed or prevented" by "any ... act reasonably beyond the control" of Mesa.  Contract, § 21.  Article 21 expressly references Article 3H (above), which includes non-operated flights "caused by some action or inaction of Delta" among the list of events beyond Mesa's control.  By definition, Commanded Cancellations are "acts reasonably beyond the control" of Mesa.

Under New York law, which governs the Contract,[5] "[a] written contract

---

[5]  Article 20A of the Contract provides that "[t]his Agreement is subject to, and will be governed by and interpreted in accordance with, the laws of the State of New York ...."

- 16 -

'will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.'" *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003) (*quoting Empire Props. Corp. v. Manufacturers Trust Co.*, 43 N.E.2d 25, 28 (N.Y. 1942)). In addition, courts should construe contracts "'so as to give full meaning and effect to the material provisions' ...." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) (internal citation omitted). Reading the Contract as a whole, and thus harmonizing Article 11 with Articles 3H and 21, as required under New York law, the purpose and intent was to exclude events beyond Mesa's control – including cancellations caused by Delta – from adversely affecting Mesa's rights and obligations under the Contract or penalizing Mesa economically. *See Westmoreland Coal Co.*, 749 N.E.2d at 670 (an agreement must be read "as a harmonious and integrated whole."). As a result, the Contract cannot be fairly interpreted as allowing Commanded Cancellations to impact Mesa's Completion Rate.

Moreover, allowing Delta to count Commanded Cancellations against Mesa's Completion Rate would eviscerate the bargained-for protections that Mesa has during the Contract's first six years – which prohibits Delta from terminating the Contract for its own convenience – because Delta could terminate the Contract

- 17 -

*at will* by simply increasing the number of Commanded Cancellations to the point

where Mesa's Completion Rate fell below 95%.  *See* Contract, § 11G.  Such an

interpretation would be contrary to fundamental principles of contract law that

favor interpretations that are equitable to both parties, as opposed to a construction

that leaves one party at the mercy of the other:

> A court will endeavor to give the [contract] construction most
> equitable to both parties instead of the construction which will give
> one of them an unfair and unreasonable advantage over the other. ...
> It is highly unlikely that two sophisticated business entities, each
> represented by counsel, would have agreed to such a harshly uneven
> allocation of economic power under the Agreement.  *'Language in
> contracts placing one party at the mercy of the other is not favored by
> the courts'* ....

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l Inc.*, 643 N.E.2d 504, 508 (N.Y.

1994) (internal citations omitted) (emphasis added); *see also Beal Sav. Bank*, 865

N.E.2d at 1213 ("A reading of the contract should not render any portion

meaningless").

Delta's interpretation that it can terminate the Contract at will simply by

increasing Commanded Cancellations also would violate Article 26 of the

Contract, which requires each party to "exercise good faith in its dealings with the

other party hereto and in performance of its obligations under this Agreement."

*See Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (The

obligation to deal in good faith "embraces a pledge that neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.") (internal quotation omitted). Certainly, Delta has the right to exercise discretion in directing Commanded Cancellations, but that exercise of discretion is bounded by express and implied obligations of good faith. If, as Delta claims, the Contract requires counting Commanded Cancellations against Mesa, then Delta breached its duties of good faith by directing just enough Commanded Cancellations to put Mesa under the minimum requirements — and concealing from Mesa Delta's plan to turn around and use Mesa's compliance with those directions to terminate the Contract. A lack of good faith is seldom so clear. As Commanded Cancellations cannot be counted adversely against Mesa, Delta's purported basis for termination — *i.e.*, utilizing improperly calculated Completion Rates — is wrongful and constitutes a breach of contract. Mesa's actual Completion Rates, when properly calculated under the Contract, exceeded 95% for the Challenged Months identified in the Termination Letter. Thus, Delta had no valid basis to terminate the Contract under Article 11F(vi).

**B.    The Doctrines of Estoppel, Waiver and Mutual Departure Bar Delta's Purported Termination.**

The plain language of the Contract is dispositive in favor of Mesa. Nevertheless, through its conduct and assurances to Mesa, Delta is also estopped

from terminating the Contract based on Completion Rates that count Commanded Cancellations against Mesa, and has waived any right to terminate on these grounds.

"The general principle of equitable estoppel prevents one party from enforcing rights which would result in a fraud or injustice upon a second party who, in justifiable reliance upon the former parties' words or conduct, had been misled into acting upon the belief that such enforcement would not be sought." *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989). Moreover, "'a contracting party may orally waive enforcement of a contract term notwithstanding a provision to the contrary in the agreement .... Such waiver may be evinced by words or conduct, including partial performance....'" *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 30 A.D.3d 1, 5 (N.Y. App. Div. 2006) (internal citations omitted). This is true even where a contract contains a no-waiver clause. *Travellers Int'l AG*, 722 F. Supp. at 1098 ("New York law allows the parties to waive...a no-waiver provision by a subsequent course of conduct.").

Delta repeatedly assured Mesa that Commanded Cancellation would not count against Mesa's completion rate and paid Mesa based on Completion Rates that did not include Commanded Cancellations:

ATI-2321471v2

- When Delta moved a significant number of Mesa's flights from Orlando to JFK, and Mesa raised concerns that JFK presented unfavorable operational and weather challenges that would make it more difficult for Mesa to earn bonus pay for superior completion rates and that Commanded Cancellations were more likely there, Delta expressly assured Mesa that its completion rate would not be adversely impacted by cancellations requested by Delta and that actions taken by Delta negatively impacting Mesa's operations would not be held against Mesa in monitoring performance under the Contract.

- Prior to March 28, 2008, Delta never stated or suggested that Mesa's completion rate under the Contract had fallen below 95% for any three out of six month period, or that the Contract was at risk of termination for any reason, including performance below minimum Contract standards.

- Furthermore, Delta consistently paid Mesa performance-related bonuses based on Completion Rates reported that did not include Commanded Cancellations, until March 2008 when Delta retroactively "recalculated" the completion rates for September 2007 through February 2008 by counting Commanded Cancellations (*and* flights delayed more than four hours but operated nonetheless at Delta's request) against Mesa in measuring its Completion Rates.

Mesa reasonably relied on Delta's assurances and conduct to its detriment, unaware that Delta would suddenly begin counting Commanded Cancellations against Mesa as a pretext for terminating the Contract. As a result, Delta is estopped from retroactively re-calculating Completion Rates that include Commanded Cancellations, and has waived any right to do so. *See Travellers Int'l AG*, 722 F. Supp. at 1098-99 (permanently enjoining TWA from terminating its

long-term contract with Travellers).

## II.   **Mesa Will Suffer Irreparable Harm If Injunctive Relief Is Not Granted.**

A failure to enjoin Delta from wrongfully terminating the Contract will result in the total loss of Mesa's Delta Connection business, representing approximately 20 percent of its annual revenue. The loss of this revenue would create an untenable liquidity crisis in light of Mesa's existing obligations with respect to its long-term debt. In addition, Mesa's Aircraft operations represent a significant investment in both equipment and human capital. The leases covering the more than $600 million worth of aircraft are long term and, given the current market conditions, it would be extremely difficult, if not impossible, to place these aircraft into similar revenue-guaranteed contracts with other carriers. As a result, termination of the Contract may jeopardize Mesa as a going concern and force the company and its subsidiaries into bankruptcy.

The U.S. Supreme Court has recognized that the substantial loss of one's business and the threat of bankruptcy constitutes irreparable harm that warrants injunctive relief:

> [A]bsent preliminary relief [plaintiffs] would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless.

*Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). Cases in this district and in

ATI-2321471v2

other federal courts have recognized this as well.  *See, e.g., Rhodes v. Gwinnett County, Georgia,* 557 F. Supp. 30, 33 n.9 (N.D. Ga. 1982) ("Where plaintiff's potential economic loss thus threatens his entire business, an injunction is appropriate even though the amount of direct financial harm is readily ascertainable.") (*citing Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 198 F. Supp. 557 (S.D. Ga. 1962), *aff'd* 305 F.2d 647 (5th Cir. 1962)); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975(2d Cir. 1989) (threat of bankruptcy constituted irreparable harm); *Travellers Int'l AG v. Trans World Airlines*, 684 F. Supp. 1206, 1216 (S.D.N.Y. 1988) ("loss of a business constitutes irreparable injury and thus is not compensable by a damage award.").  Hence, the loss of the business that will result from Delta's wrongful termination, including the threat of bankruptcy if an injunction is not entered, constitutes irreparable harm.

## III.     The Balance of Hardships Favors a Preliminary Injunction

If Delta is allowed to wrongfully terminate the Contract, Mesa will irreparably lose a substantial portion of their business that, when coupled with Mesa's long-term debt obligations, would likely force the company and its subsidiaries into bankruptcy.  In addition, Mesa will lose its substantial investment in both equipment and human capital and be left with Aircraft assets that are extremely difficult, if not impossible, to re-deploy.  Moreover, Delta's wrongful

termination will cost hundreds of employees who currently serve Delta under the Contract their jobs.

Delta, by contrast, will continue to receive the benefit of its bargain under the Contract and will assume no more risk of loss than it agreed to assume, and has assumed, since the Contract was formed in 2005. Moreover, at least over the next several months, Delta has announced plans merely to shift most of the flights that Mesa would have operated to other regional carriers, thus a preliminary injunction would not force Delta to operate flights it does not intend to; the injunction would simply direct that those flights be operated by Mesa and preserve the status quo. This minimal hardship is starkly outweighed by the total loss of Mesa's Delta Connection Business and the threat of bankruptcy. Thus, the balance of hardships tips decidedly in favor of Mesa. *See Roso-Lino Beverage Distrib., Inc. v. The Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 126 (2d Cir. 1984) (loss of plaintiff's business tipped equities decidedly in favor of plaintiff where defendant merely had to continue its contractual relationship with plaintiff for a short while); *Travellers Int'l AG*, 722 F. Supp. at 1105 (balance of equities tipped markedly in favor of plaintiff when contract termination would put plaintiff out of business, while defendant, enjoined from terminating, would retain its benefits under that contract). For these reasons, a preliminary injunction enjoining Delta's wrongful

- 24 -

termination is essential to avoid this far-reaching and lasting impact on Mesa, its customers and employees.

## IV.    A Preliminary Injunction Serves the Public Interest

In addition to the balance of hardship's tipping decidedly in favor of Mesa, a preliminary injunction would clearly serve the public interest while this matter is prepared for trial by (i) preserving a going concern business, (ii) preserving the ongoing relationship that Mesa has with its vendors, (iii) allowing Mesa to honor its lease obligations for the Aircraft with third parties, (iv) saving the jobs of hundreds of employees who serve Delta under the Contract. *See St. Petersburg Harbourview Hotel Corp. v. First Union Nat'l Bank of Fla.*, 168 B.R. 770, 773 (Bankr. M.D. Fla. 1994) (granting preliminary injunction).[6]

## CONCLUSION

For the foregoing reasons and the additional reasons and evidence to be presented at the hearing on this matter, Mesa and Freedom respectfully request that this Court exercise its equitable powers and issue a preliminary injunction against Delta in the form of the Proposed Order attached to Plaintiffs' Motion.

---

[6] Mesa also notes that Delta has agreed that "no bond or other security shall be required in connection with" any injunction restraining a breach of the Contract or requiring specific performance. Contract, § 20G. Accordingly, Delta has waived any requirement of a bond or other security.

Dated:      May 9, 2008                    Respectfully submitted,

                                           /s/ G. Lee Garrett, Jr.
                                           G. Lee Garrett, Jr.
                                              (Ga. Bar No. 286519)
                                           David M. Monde
                                              (Ga. Bar No. 515710)
                                           Michael Wolak, III
                                              (Ga. Bar. No. 773197)

                                           JONES DAY
                                           1420 Peachtree Street, N.E.
                                           Suite 800
                                           Atlanta, Georgia  30309-3053
                                           Telephone:  (404) 521-3939
                                           Facsimile:  (404) 581-8330

                                           Counsel for Mesa Air Group, Inc. and
                                           Freedom Airlines, Inc.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, I hereby certify that the foregoing

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY

INJUNCTION has been prepared with one of the font and point selections (e.g.,

Times New Roman/14 point) approved by this Court in Local Rule 5.1B.

This 9th day of May 2008.

<u>s/ Michael Wolak III</u>
Michael Wolak, III
Ga. Bar No. 773197
JONES DAY
1420 Peachtree Street, NE
Suite 800
Atlanta, GA 30309-3053
(404) 521-3939/Telephone
(404) 581-8330/Facsimile

Attorneys for Plaintiffs