UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MESA AIR GROUP, INC. and FREEDOM AIRLINES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DELTA AIR LINES, INC., <br><br> Defendant. | CIVIL ACTION FILE NO.: <br> 1:08-cv-1334-CC |

**TRIAL BRIEF OF PLAINTIFFS MESA AIR GROUP, INC.
AND FREEDOM AIRLINES, INC.**

Nearly two years have passed since this Court's June 2008 order (the "D. Ct. Order") enjoining Delta Air Lines, Inc. ("Delta") from terminating the Delta Connection Agreement (the "Agreement"). During that time, the Eleventh Circuit affirmed this Court's preliminary injunction (*Mesa Air Group, Inc. and Freedom Airlines, Inc. v. Delta Air Lines, Inc.*, 573 F.3d. 1124 (11th Cir. 2009) (the "11th Cir. Opinion"), and the parties[1] have conducted limited additional discovery, which in no way disturbs the factual findings and conclusions of law reached by this

---

[1] For purpose of this Brief, Plaintiff Mesa Air Group, Inc. will be referred to as "Mesa Air", Plaintiff Freedom Airlines, Inc. as "Freedom", and the Plaintiffs collectively as "Mesa".

ATI-2418534v7

Court or the Eleventh Circuit. Instead, the whole of the evidence that has been and will be presented supports the Court's original finding that Delta is estopped from terminating the Agreement based on Delta's recalculation of Freedom's completion rate in October and December 2007 and February 2008 and that Delta's attempt to do so is a breach of the express and implied duties of good faith and fair dealing.

Since the preliminary injunction issued:

- **The parties have amended the Agreement to resolve the issue of coordinated cancellations for all months after January 2009.** The Agreement did not require Freedom to accept coordinated cancellations, and after the preliminary injunction, Freedom declined to accept them. Subsequent to the Amendment (*see* Ex. A, March 3, 2009 Amendment 2 to the Delta Connection Agreement), Freedom accepted coordinated cancellations and, in return, Delta removed those flights from the calculation of Freedom's completion rate. Thus, the parties have resolved, but with respect to the period subsequent to January 1, 2009 only, one of the critical issues in this litigation.

- **Despite the resolution of this issue for the parties' current and future operations, Delta renewed its effort to rid itself of its obligations to Mesa by filing a separate lawsuit seeking, among other things, to terminate the Agreement.** In August 2009, Delta sued Mesa seeking a declaration that Plaintiffs are in material breach of the Agreement and stating that "Delta wishes to exercise its right to terminate the Agreement immediately." (Ex. B, *Delta Air Lines, Inc. v. Mesa Air Group, Inc.*, Adv. Proc. No. 10-03064 (Bankr. S.D.N.Y.) Complaint ¶ 43.) Mesa filed a counterclaim for breach of contract and breach of the covenant of good faith and fair dealing.[2]

---

[2] As the Court is aware, this matter was initially in front of this Court but is now being heard as an adversary proceeding within Mesa's Chapter 11 bankruptcy

- **Mesa filed for Chapter 11 bankruptcy on January 5, 2010.**  For approximately two years prior, Mesa worked closely with its lessors, creditors and other constituents to restructure its financial obligations.  Those efforts led to an elimination of over $160 million of debt obligations, the return of a number of aircraft, and the restructuring of inventory management and engine overhaul agreements.  Mesa was nonetheless faced with an untenable financial situation resulting primarily from its continued lease obligations for aircraft which exceed its current requirements.  Prior to making its Chapter 11 filing, Mesa diligently pursued opportunities to operate, sublease or sell their excess aircraft.  Unfortunately, those efforts were unsuccessful, as were attempts to negotiate terms under which these aircraft would be returned to their manufacturers or lessors.  After careful consideration, therefore, on January 5, 2010, Mesa filed a voluntary Chapter 11 petition in the Bankruptcy Court for the Southern District of New York.  Through its Chapter 11 cases, Mesa intends to reduce its excess fleet in order to eliminate expenses associated with excess aircraft which will enable Mesa to operate profitably.  *See* Decl. of M. Lotz in Supp. of First Day Mots. Pursuant to Local Bankr. Rule 1007-2, *In re: Mesa Air Group, Inc., et al.*, Case No.  10-10018-MG (Bankr. S.D. N.Y.) (Dkt. No. 2), at ¶¶ 5, 40, 59.

- **The parties have conducted limited discovery related to the merits of the claims**.  Since the injunction, Mesa has served only four additional Interrogatories (regarding Delta's counterclaim) and Delta has served nine Requests for Production.  Delta has taken an additional three hours each of testimony from Jorn Bates and Joe Serratelli, both of whom were previously deposed in this matter.  Delta also subpoenaed the deposition of its former employee, Hemang Patel (also previously deposed) in lieu of presenting him at trial, deposed Mesa's former Certificate Chief Pilot, Ryan Gumm, and took a 30(b)(6) deposition regarding Mesa's computer systems.  In support of its damages claims, Mesa has taken the deposition of the project manager of its electronic discovery vendor and has subpoenaed testimony from an airline industry consultant engaged in 2008 to assist with the restructuring that would have resulted from Delta's successful termination of the

---

(continued…)

in the Southern District of New York. Though Delta initially filed Ex. B under seal, the parties agreed to have it unsealed upon the case's transfer from this Court.

- 3 -

ATI-2418534v7

Agreement.³  Mesa has also taken a brief deposition of Delta's Anthony Canitano.

## I. THE EVIDENCE HAS SHOWN AND WILL SHOW THAT MESA IS ENTITLED TO A JUDGMENT IN ITS FAVOR.

### A. Delta should be estopped from terminating the Agreement.⁴

Just as at the preliminary injunction hearing, the evidence at the conclusion of trial will show that Delta should be equitably estopped from terminating the Agreement based on Freedom's completion rate in October and December 2007 and February 2008 because (i) Delta assured Mesa that it would not be penalized for accepting coordinated cancellations or flying flights more than four hours late at Delta's request and (ii) Delta knew that Mesa believed it had an agreement on those issues, failed to correct Mesa's belief, and took advantage of Mesa's belief by attempting to terminate the contract.

#### 1. New York law supplies the relevant legal standard.

Both this Court and the Eleventh Circuit have held that New York law supplies the legal standard governing Mesa's equitable estoppel claim.  (D. Ct.

---

³ The parties have advised the Court that the record will be left open to permit the deposition of a representative of Cadwalader, Wickersham & Taft ("Cadwalader") to be taken during the first week of May, 2010.  Cadwalader was Mesa's bankruptcy counsel retained after Delta sent its purported termination letter in March 2008.

⁴ In addition to prevailing on its claim of equitable estoppel, Mesa would also be entitled to relief based on its claims of waiver and mutual departure if, as Delta contends, Georgia law applies.

Order ¶ 65; 11th Cir. Opinion, 573 F.3d at 1128, 1131.)  New York's doctrine of equitable estoppel "prevents one party from enforcing rights which would result in a fraud or injustice upon a second party who, in justifiable reliance upon the former parties' words or conduct, had been misled into acting upon the belief that such enforcement would not be sought."  *Travellers Int'l AG v. Transworld Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989) (citing *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184, 436 N.E.2d 1265, 1269 (N.Y. 1982)).  "The elements of estoppel, in other words, are (1) a false representation, (2) reasonable reliance and (3) a detrimental change of position."  (11th Cir. Opinion, 573 F.3d. at 1129 (discussing *Nassau Trust*).)

The New York Court of Appeals has held that "[a]n estoppel rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury."  *Nassau Trust*, 56 N.Y.2d at 184, 436 N.E.2d at 1269 (internal quotation omitted).  "An estoppel defense may also be invoked where the failure to promptly assert a right has given rise to circumstances rendering it inequitable to permit the exercise of that right."  *John Robert P. v. Vito C.*, 804 N.Y.S.2d 802, 804, 23 A.D.3d 659, 661 (N.Y. App. Div. 2005); *see also Ashland Window & Housecleaning Co. v. Metro. Cas. Ins. Co. of New York*, 53 N.Y.S.2d 677, 680, 269 A.D. 31, 35 (N.Y. App. Div. 1945) (estoppel may be

ATI-2418534v7

asserted where plaintiff is prejudiced by defendant's unreasonable delay in disclaiming responsibility for payment under a contract).

### 2. Delta's words and conduct constitute a false representation.

The record evidence and the findings by this Court and the Eleventh Circuit show that Delta should be estopped from terminating the Agreement because Delta assured Freedom that flights flown more than four hours late at the request of Delta and coordinated cancellations would not be counted against Freedom's completion rate, and because Delta failed to correct Mesa's understanding that it had such an agreement. Specifically, the evidence shows:

- The parties had repeatedly in the past agreed to terms not set forth in, and modifications to, the Agreement. (D. Ct. Order ¶¶ 43-48.)

- Upon Delta's decision to relocate a significant number of Mesa's flights to JFK, Delta's Chief Operating Officer, Jim Whitehurst, assured Mesa Air's CEO Jonathan Ornstein, that Freedom would not be "penalize[d]" by the move and that Delta would "work with" Mesa on the terms of the Contract. (D. Ct. Order ¶19; Hr'g Tr. at 277:19-278:13; *see also id*. 73:17-74:11; 282:22-283:6.)

- On February 7, 2007, Freedom's Chief Operating Officer, Jorn Bates, sent the Director of Delta Connection, Courtney Boyd, an e-mail "to recap for agreement" that coordinated cancellations "will be credited to Freedom for purposes of incentive payments and minimum performance calculations on the commercial side" (D. Ct. Order ¶ 21) and that Freedom will be "credited with [ ]completion" for flights operated beyond the four-hour limit at Delta's request. (Pls.' Ex. 47.)

ATI-2418534v7

- Mr. Bates sent Ms. Boyd two follow-up e-mails on this topic, but Ms. Boyd "did not respond and never rejected such an agreement." (D. Ct. Order ¶22; 11th Cir. Opinion, 573 F.3d at 1129.)

- Sometime in late March or early April 2007, Mr. Bates and Ms. Boyd, orally agreed that coordinated cancellations would not be counted against Freedom (*id.* ¶¶20-28) nor would flights flown more than four hours late at Delta's request. (Hr'g Tr. 306:20-307:04.)

- After testifying on four separate occasions, Mr. Bates is "100 percent" sure with "no doubt in [his] mind" that he had an agreement with Courtney Boyd. (Nov. 13, 2009 Dep. of J. Bates 272:23-273:1; 336:22-337:3.) Mr. Bates' testimony on his agreement with Ms. Boyd "is credible, and corroborated by the various e-mails introduced into evidence," while Ms. Boyd's testimony "on this point" is not credible. (D. Ct. Order ¶¶ 28, 69; 11th Cir. 573 F.3d. at 1130.)

- Delta failed to respond to a July 13, 2007 e-mail to Ms. Boyd and several other Delta officials, in which Mr. Bates objected to Delta's attempt to conflate coordinated cancellations with other types of cancellations, because it would "cloud the commanded cancellations we get credit for on the commercial side." (D. Ct. Order ¶ 26; *see also* 11th Cir. Opinion, 573 F.3d at 1129; Pls.' Ex. 45.) No one at Delta challenged Mr. Bates' assertion that coordinated cancellations did not count against Freedom. (D. Ct. Order ¶27; *see also* 11th Cir. Opinion, 573 F.3d at 1129.)

- In the fall of 2007, Freedom began excluding coordinated cancellations from the completion rate calculated on its invoices to Delta. (D. Ct. Order ¶31; 11th Cir. Opinion, 573 F.3d at 1129.)

- Delta had the ability to and did track Freedom's operational performance daily. (May 21, 2008 Dep. of C. Boyd 144:16-18; 119:1-5; 121:2-7.)

- In a December 21, 2007 e-mail, Freedom's Bud Tyler informed Delta's Hemang Patel and his superior, Chris Higgins – Freedom's primary points of contact at Delta regarding billing issues – that the September 2007 invoice backed out coordinated cancellations based on "the proviso

that these flights would not count against our completion factor." (D. Ct. Order ¶ 34; Pls.' Exs. 14, 40.) Mr. Higgins acknowledged that, from Mr. Tyler's e-mail, Delta had knowledge of Freedom's exclusion of the coordinated cancellations but nevertheless did not respond. (D. Ct. Order ¶ 35; *see also* Hr'g. Tr. 353:13-354:21; 11th Cir. Opinion, 573 F.3d at 1129.)

- Rather, Delta's only response to the September 2007 invoice – as well as the October 2007 and November 2007 invoices that similarly excluded coordinated cancellations and flights flown over four hours late from Freedom's completion rate – was to pay Freedom. (D. Ct. Order ¶¶ 36-37; Hr'g. Tr. 228:24-229:23; 353:2; 455:14-256:2; C. Boyd Dep. 126:24-127:3, 127:14-20; *see also* 11th Cir. Opinion, 573 F.3d at 1129.)

- In February 2008, Mr. Bates again e-mailed Ms. Boyd describing their agreement that "any [coordinated] cancellations would be backed out" from the completion rate. (D. Ct. Order ¶ 49, Pls.' Ex. 43; *see,* 11th Cir. Opinion, 573 F.3d at 1129.) Once again, Ms. Boyd did not respond to this e-mail "or in any way indicate to Mr. Bates that there was no such agreement." (D. Ct. Order ¶ 49, *see* 11th Cir. Opinion, 573 F.3d at 1129.)

Even apart from the agreement between Jorn Bates and Courtney Boyd, "Delta's failure to take reasonable steps to correct Mesa's alleged misunderstanding" is sufficient conduct to satisfy New York's falsity requirement. 11th Cir. Opinion, 573 F.3d at 1129; *see also John Robert P. v. Vito C.*, 23 A.D.3d 659, 804 N.Y.S.2d 802, 804 (App. Div. 2d Dep't 2005) (noting that false conduct includes "the failure to promptly assert a right [where such failure] has given rise to circumstances rendering it inequitable to permit the exercise of the right").

### 3. Mesa reasonably relied to its detriment on Delta's words and conduct.

Not surprisingly, Mesa relied on Delta's words and conduct. As this Court found and the Eleventh Circuit reiterated, even though Mesa had a legal right to refuse to comply with Delta's cancellation requests, (D. Ct. Order ¶ 11; 11th Cir. Opinion, 573 F.3d at 1132; Hr'g. Tr. 184:10-15) between September 2007 and March 2008, Delta directed Freedom to cancel more than 400 flights and Freedom cancelled those flights as requested. (D. Ct. Order ¶ 30; 11th Cir. Opinion, 573 F.3d at 1127, 1130; Pls.' Resp. to Delta's Interrog. No. 10.) This was a substantial increase compared to the two years Freedom operated out of Orlando, during which Delta directed only 60 coordinated cancellations. (D. Ct. Order ¶ 30; 11th Cir. Opinion, 573 F.3d at 1127; Pls.' Ex. 53 at 3.) Delta directed Freedom to cancel these flights in order to give preference to its own flights.[5] (D. Ct. Order ¶ 17; 11th Cir. Opinion 573 F.3d at 1127.)

Mesa would have immediately stopped acquiescing to Delta's requests if it had known that Delta intended to count hundreds of coordinated cancellations

---

[5] For example during October and December 2007, Delta ordered the cancellation of 5.5% of Freedom's flights. By contrast, Delta cancelled approximately 1.6% of its own flights. (11th Cir. Opinion, 573 F.3d at 1132; *see also* D. Ct. Order ¶ 17, n.2.) In October 2007 alone, Delta directed cancellation of 78 Freedom flights while cancelling only 8 of its own. (D. Ct. Order ¶ 30; 11th Cir. Opinion, 573 F.3d 1132; Pls.' Ex. 53.)

toward Mesa's completion rate.  (D. Ct. Order ¶ 41; 11th Cir. Opinion, 573 F.3d at 1132.)  And, therefore, but for Delta's assurances, Mesa would likely have operated a number of the flights that were cancelled at Delta's request.  (*Id.*)

New York law is clear that an estoppel may rest upon the "*deed* of one party upon which another rightfully relies." *Nassau Trust*, 436 N.E.2d at 1269 (emphasis added).  Freedom's acceptance of the more than 400 coordinated cancellations believing it would not be "penalize[d]" (D. Ct. Order ¶ 19; Hr'g. Tr. 277:6-13) demonstrates that it "justifiably relied on [Delta's] conduct to its disadvantage." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 106-07, 850 N.E.2d 653, 658 (N.Y. Ct. App. 2006).

> **B.    Delta capitalized on its failure to correct Mesa's belief, violating the express and implied duty of good faith and fair dealing.**

Finally, Delta had a duty to take reasonable steps to disclose its objection to Mesa's treatment of coordinated cancellations and flights flown more than four hours late.  (*See* 11th Cir. Opinion, 573 F.3d at 1129-30.)  Completely apart from this Court's and the Eleventh Circuit's finding that Delta was equitably estopped from terminating the Agreement, this Court already has found that Delta's conduct violated the express and implied duty of good faith and fair dealing.  (D. Ct. Order ¶¶ 78-79.)  In addition to the common-law obligation "that neither party shall do anything which will have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract" (*Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291, 87 N.Y.2d 394 (N.Y. Ct. App. 1995)(internal quotation omitted)), the Delta Connection Agreement *expressly requires* the parties to "exercise good faith in dealings with the other party hereto and in performance of its obligations under this Agreement" (D. Ct. Order ¶ 78; Pls.' Ex. 21 at 35, Art.26).  Under this standard, this Court already has held "[f]or Delta to exercise its discretion to terminate the Contract on this basis is contrary to the express duty of good faith in the Contract and the duty of good faith implied in every contract."  (D. Ct. Order ¶ 79; Pls.' Ex. 54 at 3.)

     Delta's bad faith termination was the final step in Delta's plan to respond to rising fuel prices by "actively enforcing exit provisions in contracts" in order to reduce regional jet capacity.  (D. Ct. Order ¶ 51; 11th Cir. Opinion, 573 F.3d at 1127-28; Pls.' Ex. 56 at 3.)  In fact, internal Delta documents from as late as March 2008 demonstrate that Delta desperately wanted to cancel the Contract but even then believed that Freedom was not in default.  (D. Ct. Order ¶¶ 50-51; Hr'g. Tr. 448:11-449:5; Pls.' Ex. 56 at 3.)  The plan singled out the Mesa ERJ Agreement for cancellation.  (D. Ct. Order ¶ 51; 11th Cir. Opinion, 573 F.3d at 1128; Pls.' Ex. 56 at 3.)  Subsequently, Delta initiated negotiations to buy out the Mesa contract, and when negotiations proved unsuccessful, Delta, after recalculating Freedom's

completion rate to include Delta-directed coordinated cancellations as incomplete flights, sent Mesa a letter purporting to terminate the Agreement. (D. Ct. Order ¶ 53; 11th Cir. Opinion, 573 F.3d at 1128.)

Indeed, the record evidence credited by this Court and the Eleventh Circuit[6] more than evinces Delta's bad faith:

- Delta assured Mesa that it would not be "penalize[d]" by moving to JFK. (D. Ct. Order ¶ 19; 11th Cir. Opinion, 573 F.3d at 1127.)

- On at least six occasions, someone from Freedom sent an e-mail to one or more persons at Delta disclosing that Freedom was excluding coordinated cancellations from its completion rate. (D. Ct. Order ¶¶ 21, 22, 26, 34, 49; *see also* 11th Cir. Opinion, 573 F.3d at 1129.)

- No one at Delta *ever* responded to any of these e-mails or objected to Freedom's calculation method. (D. Ct. Order ¶¶ 22, 27, 35, 49; *see also* 11th Cir. Opinion, 573 F.3d at 1129-30.)

- Freedom excluded coordinated cancellations from its calculation of the completion rate in the September 2007, October 2007, and November 2007 invoices. (D. Ct. Order ¶¶ 33, 37-38.) Even though Delta had information in its possession to confirm Freedom's calculation, it did not object to Freedom's exclusion of coordinated cancellations. (D. Ct. Order ¶¶ 35-37). In fact, Delta's only response was to pay the invoices. (D. Ct. Order ¶¶ 36-37; *see also* 11th Cir. Opinion, 573 F.3d at 1130.)

---

[6] Although the Eleventh Circuit did "not reach Mesa's alternative argument that Delta's attempt to terminate the Connection Agreement breached its implied duty of good faith" (573 F.3d at 1132 n.9), the Court of Appeals did rely in its Order affirming the injunction on many of the facts that also support this Court's conclusion that Delta has acted in bad faith.

- As Ms. Boyd herself admitted, Delta knew of Freedom's practice "of taking credit for coordinated cancellations in the calculation of the completion rate, but failed to inform Freedom that Delta considered this practice to be contrary to the Contact." (D. Ct. Order ¶ 70; Hr'g. Tr. 631:14.)

- Prior to the termination letter on March 28, 2008, Delta never communicated to Freedom that its completion rate had fallen below 95% for any three months during any consecutive six month period. (D. Ct. Order ¶ 55; *see also* Pls.' Ex. 48, Delta's Resp. to Req. for Admission, No. 52) To the contrary, in both January 2008 and March 2008, Delta had informed Freedom that its performance under the Contract had been "excellent" and that it should expect "increased flying at JFK by summer." (D. Ct. Order ¶ 5; Pls.' Ex. 66.)

Thus, even before considering Ms. Boyd's assurance that Delta would not hold against Mesa coordinated cancellations or flights flown more than for hours late at Delta's request (D. Ct. Order ¶¶ 20-28; *see also* 11th Cir. Opinion, 573 F.3d at 1130), the other facts already in evidence readily establish that "Delta purported to exercise its discretion to terminate the Contract based on its recalculation of the completion rate," but "has proffered no explanation for its failure to inform Freedom, prior to termination, that Delta disagreed with Freedom's practice of calculating completion rates." (D. Ct. Order ¶79; Pls.' Ex. 54 at 3; Hr'g Tr. 469:5-22.) This failure to raise the issue with Freedom, and the ensuing attempt to cancel the Agreement, plainly "indicate[] bad faith" by Delta. (*Id.*)

- 13 -

This conclusion is further supported by this Court's finding that Delta's own "representations, omissions and conduct" created the very basis by which Delta used to terminate the contract. (D. Ct. Order ¶ 79 (finding that "the evidence shows that but for Freedom's cooperation with Delta's requested Coordinated Cancellations, Freedom's completion rate in October and December 2007 would have exceeded 95%").) Termination on these grounds thus violates Delta's "pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 87 N.Y.2d at 389, 663 N.E.2d at 291 (internal quotation omitted).

## II. DELTA'S BAD FAITH AND MALICIOUS CONDUCT ENTITLES MESA TO RECOVER ITS LITIGATION EXPENSES.

Mesa's Complaint seeks its "attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11 or as otherwise may be provided by law." (Complaint ¶ 105.)

New York courts recognize an exception to the general rule that a party must carry its own legal costs, known as the "bad faith exception." *In re John T.*, 42 A.D.3d 459, 839 N.Y.S.2d 783 (N.Y.App. Div. 2 2007). The bad faith exception has been applied by New York Courts to award attorneys' fees to a plaintiff where there is a showing that the defendant "intentionally sought to inflict economic injury on [plaintiffs] by forcing them to engage legal counsel." *United Pickle v.*

*Omanoff*, 63 A.D.2d 892, 892, 405 N.Y.S.2d 727, 728 (N.Y. App. Div. 1 1978). Under New York law, this is an "actionable wrong". *Id*.

In New York, "malice may consist of any personal hatred or ill will, any improper or sinister purpose, or any reckless disregard for the rights of others which is *inconsistent with good faith* or the mere purpose to further the ends of justice." *Tender Trap v. Huntington*, 100 Misc. 2d 108, 115, 418 N.Y.S. 2d 537, 543 (N.Y. Sup. Ct. 1979) quoting 36 NY Jur., Malicious Prosecution § 26, p.286. This Court already has found that "[f]or Delta to exercise its discretion to terminate the Contract on this basis is contrary to the express duty of good faith … ." (D. Ct. Order ¶ 79.)

Likewise, there is no question that Delta's improper attempt to terminate the Agreement forced Mesa to incur legal fees to (1) secure an immediate preliminary injunction, (2) defend that injunction from Delta's immediate appeal of this Court's findings, and (3) litigate this matter to a final hearing. *See Tender*, 100 Misc. 2d at 115, 418 N.Y.S. 2d at 542 (awarding fees incurred in an "injunction action, the appeal which followed it, and the declaratory judgment action"). As this Court already has found, Delta's improper and bad-faith termination of the Agreement made a bankruptcy filing by Mesa "both likely and imminent." (D. Ct. Order ¶¶ 78-79, 82.) Moreover, the testimony shows and will show that the

ATI-2418534v7

engagement of bankruptcy counsel and restructuring advisors was "proximately related" (*United Pickle Co.*, 63 A.D. 2d at 893, 405 N.Y.S.2d at 728) to Delta's purported termination of this Agreement. (Hr'g Tr. 116:05-10; 116:22-117:02; 1102-10 (testimony of Michael Lotz).) Thus, because Mesa's legal expenses were "proximately related to the malicious acts" of Delta, Mesa is due to be compensated for those expenses. *United Pickle*, 63 A.D. 2d at 893, 405 N.Y.S.2d at 728. "The fact that the devices [] utilized to harass and oppress [Mesa] were legal procedures does not relieve [Delta] from liability for those legal fees." *Id.*

Mesa also would be entitled to its attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11, which provides that a party's litigation expenses are recoverable "where the defendant has acted in bad faith". *See also Wheat Enter., Inc. v. Redi-Floors, Inc.*, 231 Ga. App. 853, 856, 501 S.E.2d 30, 35 (1998). In Georgia, bad faith "has been defined as 'actual or constructive fraud or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake, but prompted by some sinister motive.'" *ADP-Fin. Computer Servs., Inc. v. First Nat. Bank of Cobb County*, 703 F.2d 1261, 1267 (11th Cir. 1983) (quoting *Schaffer v. Wolbe*, 113 Ga. App. 448, 148 S.E.2d 437 (1966)). Critically, even where there is a bona fide controversy as to liability, a court may find that a defendant acted in

ATI-2418534v7

"atrocious bad faith" in its dealing with the plaintiff and award attorneys' fees. *City of Lilburn v. Astra Group, Inc.*, 286 Ga. App. 568, 571, 649 S.E.2d 813, 816 (2007). Just as under New York law, the facts already in evidence in this case, most notably the Court's finding that Delta has acted in bad faith (D. Ct. Order ¶¶ 78-79; *see also supra* p. 14), also support the award of litigation expenses under Georgia law.

### III. CONCLUSION

Based on the evidence presented at the preliminary injunction hearing and the evidence to be presented at trial, Mesa respectfully requests that the Court enter and Order finding that:

1. Delta's proffered grounds for termination of the Contract set forth in its March 28, 2008 letter (attached hereto as Ex. C, previously marked Pls.' Ex. 57) are not valid;

2. the Contract remains in effect, subject to its terms;

3. Delta's conduct constitutes a breach of the express and implied covenants of good faith and fair dealing; and

4. Plaintiffs are entitled to recover their litigation expenses and other damages as may be provided by law.

Respectfully Submitted, April 16, 2010

        JONES DAY

        /s/ G. Lee Garrett, Jr.
        G. Lee Garrett, Jr.
        Georgia Bar No. 286519
        David M. Monde
        Georgia Bar No. 515710
        Robert A. Schmoll
        Georgia Bar No. 100178
        Kacy G. Romig
        Georgia Bar No. 105576
        1420 Peachtree Street, N.E.
        Suite 800
        Atlanta, GA  30309-3053
        (404) 581-3939 Phone
        (404) 581-8330 Fax

        *Attorneys for Plaintiffs Mesa Air Group, Inc. and Freedom Airlines, Inc.*

- 18 -

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following counsel of record:

>Catherine M. O'Neil
>David E. Meadows
>Joseph P. Rockers
>KING & SPALDING LLP
>1180 Peachtree Street
>Atlanta, Georgia 30309

>/s/ G. Lee Garrett, Jr.

>JONES DAY
>1420 Peachtree Street, NE, Suite 800
>Atlanta, GA 30309-3053
>(404) 581-3939/Telephone
>(404) 581-8330/Facsimile

>Attorney for Plaintiffs

ATI-2418534v7